Van Brunt, P. J.
The wisdom of the rule that divorces should not be granted upon the evidence of prostitutes and private detectives is strikingly illustrated by the nature of the testimony offered to support the allegations of the complaint in the case at bar.
The prostitute influenced by money or for the gratification of feelings of revenge seems willing to answer in any way desired; and the private detective furnishes the evidence which he is employed to procure even though he has to resort to his own fertile brain for the facts or the supposed facts upon which he founds his testimony.
The complaint in this action makes three charges of adultery against the defendant, one committed on the 13th of November, 1885, at No. 48 West Twenty-sixth street, in the city of New York, with a woman unknown; another on the 28th of November, 1885, at the same place, with a woman unknown, and another on the 11th of December, 1885, at No. 37 East Twenty-seventh street, with a woman unknown.
Divers witnesses were examined for the purpose of supporting the charges, and the referee before whom the case was tried has found only one of them to be supported, namely, the charge that on the 28th of November, 1885, at No. 43 West Twenty-sixth street, the defendant committed adultery with a woman named Lotta Forbes.
The evidence to support the charges contained in the complaint consisted principally of that of a private detective named George S. Ohase, and the woman with whom the adultery of the 28th of November was alleged to have been committed. The evidence of Chase tends to show that on the 11th of November, 1885, he was employed by the plaintiff’s attorney to act as detective upon the conduct and movements of the defendant; that on the 13th of November he saw the defendant enter the house No. 48 West Twenty-sixth street at about half-past four in the afternoon; that he remained there three-quarters of an hour; that he saw him while he was in the house in the third story front room; that he saw a woman in the room; that she lit the light, and he stepped over and pulled one shade down, and she pulled down the shade of another window.
The detective testified that at another time he saw the defendant enter this house between seven and eight o’clock; that a young man was with him whom he did not know; that they went into the hall and spoke to the colored woman, and turned round and came out; that on the 28th of November, 1885, he saw the defendant again enter that house alone; that he saw him in the same room; that he *802 saw the woman light the light, and as she lit the light again, pull the shade down of one window and go to the other window and pull that shade down; that the defendant remained in there about three-quarters of an hour, and that he and this woman came out and walked together to the Sixth avenue and went to Twenty fourth street to the back entrance of Koster & Bials’, and she went in, he bidding her good night and coming away; that he subsequently went into Koster & Bials’ and saw the woman upon the stage. On the 1st of December, 1885, the detective swears that he saw the defendant in Bast Twenty-seventh street about nine o’clock in the evening; that he came out of his father’s house, and after going to several places in Twenty-seventh street he met a woman, wdth whom he had conversation for a few seconds and walked back to No. 33 East Twenty-seventh street, where they entered the house; after they had gone in the detective stepped up to the stoop to wait awhile; that while there a woman came up and spoke to him; that after waiting a little longer he went in and went up stairs, and when he got up stairs went to the door and found it locked, and after having tried the door he stepped back again and heard it unlock; he then went to the door and the defendant came out; he was in the act of putting his top coat on; that the detective said “hello, Frank,” and he said “that’s all right,” and passed down stairs; that the detective then went into the room and saw the woman standing in the middle of the room with nothing on but her chemise; that the bed was in the middle of the room and the clothes were turned down and pretty well mussed; that he said nothing to the woman and the woman said nothing to him.
The detective swears that this house was a house of ill-fame, which is probably the only thing that he swears to that is at all worthy of credit.
Evidence was also offered by a witness named Frank Daley as to the occurrence in Twenty-sixth street, and by a witness named W S. Chase, brother of the witness George S. Chase, as to the occurrence of the 28th of November in Twenty-sixth street.
It would appear that this detective realized the fact that his evidence was entirely unworthy of belief, and that he thought it necessary to have present equally reliable witnesses whenever it became necessary to prove facts which would justify the finding of the commission of an act of adultery.
Frank Daley was examined as a witness as to the trans*action in Twenty-seventh street on the first of December. He testified to being with George S. Chase upon that evening at his request, and that he recognized the defendant. *803 from a photograph which was shown to him by Chase; that he saw him enter the house No. .33 East Twenty-seventh street with a woman; that he saw Chase go into the house, and saw the defendant come out alone, having been in there about half to three-quarters of an hour and that Chase came out immediately afterwards.
Upon cross-examination this witness had evidently lost all his memory. It appears that he made an affidavit in this case stating that on the 9th of December, 1885, a copy of a summons in this action was given to him by plaintiff’s counsel for service upon the defendant; and that deponent on the said day made inquiries at the residence of Christopher Moller, of the attendant there, for the whereabouts of Frank C Moller, the defendant in this action, etc. Upon being asked as to whether he had made an affidavit in this case, he answered that he had not; and he further testified that he never had the summons and complaint in his possession'of a copy of it, that neither Mr. Jenks nor any one in his office ever gave him any papers in this case; that he never went to any house in Madison avenue with Chase or alone; that he knew where Dr. Moller’s house was, but that he never went to that house and never made any inquiries there. When asked whether he was sure of it, he answered that he did not recollect it; and when asked whether he would be likely to recollect it if he did, he answered, “I guess I would; I don’t know much about it; I don’t know much about this kind of business.” When confronted with the affidavit he attempts to meet it by claiming to have misunderstood the question in reference to his visit to Dr. Moller’s house and his making inquiries there, although he still adheres to the story that he never had a copy of the summons and complaint in his possession. When asked in regard to the identity of the woman with whom the defendant is alleged to have gone into the house in Twenty-seventh street, he says that he could not identify her, although he saw her just as distinctly as he he saw the defendant. When asked what kind of looking woman she was, young or old, he says that he took her to bé middle-aged and that he meant by middle-aged between nineteen and thirty-five or forty. He could not tell what kind of a cloak she had on or whether she was fight or dark complexioned, or whether she had a hat on or not. He saw she had a vail or something on her head, but could not tell whether it looked like a vail or not; nor could he tell whether she was short or tall. And yet, having seen her just as distinctly as he saw the defendant, he identifies the defendant without hesitation, but is utterly unable to give the slightest description of. the woman with whom the defendant is alleged to have been. The fact that the witness *804 never appeared before the referee to sign his testimony as requested and as he promised to do shows that he probably had some hesitation in putting his signature to his evidence.
In support of the allegation of the adultery committed on the twenty-eighth of November, at No. 48 West Twenty-sixth street, William S. Ohase, a brother of the detective George S. Ohase, was examined, who happened to be conveniently present at the critical moment when the defendant is alleged to have gone into this house.
The statement of William S. Ohase is that he went to find his brother and found him at the corner of Thirty-first street and Madison avenue, and that while there his brother showed him a photograph of the defendant;- that he saw the defendant and another young man come out of the house, 149 Madison avenue, between seven and half-past seven in the evening; that he followed them for some time and finally, at the corner of Broadway and Twenty-ninth street, the two halted; the young man turned and went back up Broadway, and the defendant walked down Broadway to Twenty-sixth street, to No. 48; that he rang the bell and a colored woman came to the door, and the next thing the witness saw of Moller was in the third story (the gas was fit), he pulled down one shade and the woman pulled the other down; that this was just eight o’clock, the witness knowing that fact, because he asked his brother what time it was; that the witness saw Moller at the window nearest Sixth avenue; that the defendant remained in that house about half an hour, and the next the - witness saw of the defendant was down on the sidewalk with this woman; that they walked down Sixth avenue to Twenty-fourth street, to ítoster & Bials; he tipped his hat and she went in and he walked to Sixth avenue.
A comparison of the testimony of the two Chases shows conclusively the collusion between the two, and that the lesson of the one or the other was unfortunately forgotten. It is to be noticed that William S. Chase testifies to incidents happening on the twenty-eighth of November, which George S. Chase testifies to as happening on the other times when he says he saw the defendant go to this house. George S. Chase states, and is particular in his statement, that on the thirteenth of November the woman pulled down one shade and the man the other, but that on .the twenty-eighth of November the woman pulled down both shades. William S. Chase states that on the twenty-eighth of November the woman pulled down one shade and the man the other.
There is another confusion between them as to the occurrences testified to by them. William mentions the fact of the young man being with the defendant on the twenty- *805 eighth of November. It is true that he states that he left the defendant prior to his going to the house in Twenty-sixth street, but he also states that a colored woman let in the defendant on that occasion. George mentions the young man as having been with the defendant on the twenty-sixth, and also the fact that a colored woman came to the door and that the defendant did not go in on that occasion.
The colored woman was also examined as a witness, and she testified that she only saw the defendant at the house upon one occasion, and that was at a time when he did not go in. There is another important discrepancy between the testimony of George and William Chase. George is positive that the gas light, which was lit, was not between the windows, but was towards Broadway nearest to the wall or partition, and that it swung out towards the edge of the window. William swears that the gas light was in the centre of the room, that it hung down from the ceiling and was a chandelier, and when asked how he knew if he didn’t see it, he said that he could see both sides of the wall, and that without seeing the gas jet or the chandelier he could tell standing on the other side of the street where the gas was located; that it was in the centre and did not come from the side nor from the front.
These contradictions alone seem to be entirely sufficient to throw complete discredit upon the testimony of George S. Chase, did not his testimony itself contain numerous evidences of falsity entirely independent of any testimony which was offered upon the part of the defendant. One portion shows conclusively that as to the incident in Twenty-Seventh street, Chase has testified falsely; and the referee so believed because he has not reported as to that adultery. He is also contradicted pointedly by Lotta Forbes as to seeing her on the stage of Koster & Bials, as she never appeared upon the stage at that place.
Upon cross-examination Chase was examined as to the details of these transactions on Twenty-Sixth and Twenty-Seventh street which he testified to, and he was also examined as to some subsequent visits which he made to those houses in search of the evidence which he desired to procure on behalf of the plaintiff. His testimony as to the number of visits which he made to those various places was of the most contradictory character; at one time swearing that he was there only twice; at another three times, and upon being pressed upon cross-examination, it was shown that he had been there four times. After having testified that in his investigation in regard to the matter he never made any effort to find out the names of any one of these women with whom it was alleged that the *806 defendant had committed adultery, and having reiterated that fact more than once, and having been asked whether he had not been instructed to ascertain who these women were, and having testified that he had not, upon a subsequent examination his memory seems to have been refreshed, and he testified that he distinctly made efforts to find out what the names of these women were, having been so instructed by the counsel for the plaintiff, and that at the time of making these visits he had not forgotten these instructions.
The story which this witness gave of his entry into the house in Twenty-Seventh street, of his calling the defendant by name as he came out of the room by his first name, Frank, of his forcing his way into the room where the woman was with whom it was alleged Holler had been hawing carnal connection, is one of the most incredible stories that ever was narrated in a court of justice. Prior to this time Chase had never spoken to Holler and had no acquaintance with him whatever, and yet he salutes him “Hello, Frank,” as one of his most intimate friends, and Holler takes no notice of such a salutation from a perfect stranger He then forces himself into a woman’s apartments, which had been just left by Holler, and not a word is spoken either by the woman or by himself. This statement is utterly incredible, and unworthy of belief if Chase had not been abundantly contradicted by other testimony in the case.
Upon cross-examination, Chase further states that the next time he saw the defendant after the Twenty-seventh street incident, was on the first of December, at the Narragansett hotel, in Providence; that he told the defendant that he was there to serve him with a copy of the summons and complaint in this action; that the defendant wanted to know what it was for, and Chase told him for divorce; the defendant wanted to know on what grounds and Chase said adultery, the defendant wanted to know if they had the proof, and Chase said they had; the defendant wanted to know where, and Chase told about seeing him on three occasions in Twenty-sixth street, and also seeing him the last time go to Foster & Bials -with a woman, and also about seeing him in-Twenty-sixth street on December first, that the defendant “kind of smiled” and said “ Twenty-sixth street, that’s all right, but Twenty-seventh street, I will leave that until later,” to which the witness made no reply, although that was the place in which he pretends to have seen the defendant and to have spoken to him and the defendant to have replied. It turns out upon further examination that he was not in Providence until the 1th of December, and he swears that that was the first time he had ever spoken to the defendant. How this *807 is to be reconciled with his previous testimony as to his having spoken to the defendant in the Twenty-seventh street house, and with his having conversed with him on December first, it is difficult to imagine. It is true that subsequently when his attention is called to this contradiction as to having seen him in Providence on December first, he attempts to excuse himself by claiming to have misunderstood the question. But it was evident that it was a statement of what he intended to testify to in the first instance, and an endeavor in the second to cover up what was a manifest forgetfulness as to the story he had already told. This witness swears as to the character of the house in Twenty-sixth street, and also as to the character of the house in Twenty-seventh street, with the greatest confidence when it subsequently appears that he has not the slightest knowledge as to the character of the house in Twenty-sixth street whatever. The evidence seems to be that the house in Twenty-seventh street was probably a house of prostitution; but it appears from the evidence of Dr. Van Schaick, who was an entirely disinterested and credible witness that, instead of the defendant being at this house in Twenty-seventh street on that evening, he spent it with him at his own office in 150 West Thirty-fourth street. This evidence seems to have been of so certain a character, that the referee has failed to find the fact of the commission of adultery in this house, although if Chase was to be believed, that testimony was decidedly the most direct. If the Detective Chase was successfully contradicted in regard to that testimony, it is very evident that his testimony should not have been believed in regard to any other fact in the case.
The plaintiff sought to reinforce the testimony of Chase by that of Alice Brooks, who was a laundress and who says that she saw the defendant in the room of Annie De Forest, which she stated was in the third-story front room, which room, however, it appears was not occupied hy Annie De Forest except for one night, but was occupied hy Lotta Forbes. She testified that Annie De Forest occupied the third-story front room, and that the first time the witness did laundry work for her was along in the fall, and that then she went away and came back again, and was there a month before Christmas. She describes Annie De Forest as a girl, with blond, short hair, and states that she saw the defendant (recognizing a photograph), and Annie De Forest in this third-story front room, sitting together on a lounge that she brought in the wash and Annie De Forest asked the defendant for some money and he gave her $3.50 to pay the witness for the washing; that the witness stayed fifteen to twenty min *808 ufes and on the next day saw on the mantlepiece in the-room the photograph of the defendant.
Upon cross-examination she said that that was along about Christmas; before Christmas. When asked how long before Christmas, she guessed it would be about a week before Christmas. When asked: “Not any more than a week?” she answered: “I don’t think so,” and when testifying as to the. time when she saw the gentleman whom the photograph represented in that room, she states that it. was a month before Christmas, in November, tha it was.not in October and not in December, a very material contradiction of her previous statement. It further appears that Annie De Forest was a brunette, and that Lotta Forbes was a blonde.
This witness was also examined as to the reputation of the house, and she states that its reputation was bad. When asked if she knew anything about it, she stated that she did not, and that so far as she knew, although she-worked for the house, there was not a prostitute in the house. And this seems to have been the character of the testimony as to this house, both by the police officer and others who were examined on that subject, swearing upon direct examination that its reputation was bad, and showing upon cross-examition that they knew nothing, whatever, in respect to it, and they had never heard that it was of bad reputation.
It now becomes necessary to consider the only evidence in the case and that is the evidence of Lotta Forbes. She swears positively that she is a prostitute; that she had been so for a year; that she was living at this house in Twenty-sixth street, and that the defendant visited her, and had carnal connexion with her.
That the defendant did visit her in this house seems to be beyond questionand that when the charge was made in the complaint' of his having committed adultery in this house on certain days, he undoubtedly supposed the charge would‘be made that such act had been committed with the witness Lotta Forbes; and this fact caused him to procure his counsel to write the letter to her when she was at New Orleans which has been introduced in evidence, and made him anxious as to the testimony which she might be called upon to give in reference to this matter and caused him to make the promises that he did if she would testify upon his behalf.
An examination of the testimony of this witness shows such a complete perversion of the various circumstances to which she testifies that no credit can be placed upon any part of her testimony. Her characterization of the action of the counsel of the defendant Wilson and Hathaway" *809 shows the animus with which she came upon the stand and her utter untruthfulness. She puts words in their mouths which it is evident came from her own; and she would lead us to believe that they were instructing her to swear to what they knew to be false, when she admits that she never either directly or indirectly stated to them that she had ever had any criminal relations with the defendant. She further states that when they got her under the influence of liquor they got her to sign a paper that they wanted, and after that she was no longer needed. It appears from her own testimony that if she was intoxicated at the time she signed the paper, neither the defendant nor his counsel had any part in procuring such intoxication, and there is no evidence that when they came to the house to procure the signature to this paper, that they had the slightest knowledge that she was under the influence of liquor. The evidence seems to be conclusive that she was not only not under the influence of liquor, but that she read this affidavit and understood it before she swore'to it.
It further appears that the reason why she testified against the defendant in this case was because the defendant had failed to keep his engagement to pay her certain moneys which she claimed to have lost by reason of inability to keep professional engagements; never having intimated to his counsel in all the interviews which she had with them that there was any truth whatever in the charges of criminal intercourse between them, but on the contrary,' asserting the fact that no such intercourse had ever taken place.
The evidence of this woman is also to the effect that the house in question in Twenty-eighth street where she lived was respectable so far as she knew outside of herself, yet she takes pains to tell the landlady that she had a gentleman friend remain there all night with her, and yet the landlady made no objection. It is to be observed, however, in passing, that a number of the inmates of the house in question were examined, and the testimony was uniform in regard to the fact that it was not a house of prositution. And the mere fact that the defendant visited this house was therefore not the slightest evidence of any impropriety having been committed therein by him.
If the evidence in regard to the Twenty-seventh street house had been satisfactory, an entirely different result might have been arrived at. But the testimony of Dr. Van Schaick completely demolishes the evidence of Chase in reference to that house, and it was evidently so considered by the referee, as he refused to find that charge substantiated. The evidence of the detective Chase thus being stricken *810 from the case necessarily the whole case against the defendant depends upon the evidence of this prostitute, Lotta Forbes, who has sworn to the contrary of her testimony upon the trial uninfluenced, as she states, by any promise of money, and who is contradicted upon material points by credible witnesses, and whose testimony is evidently actuated by a spirit of malice and revenge.
There are many other points of contradiction to which attention might be called, but sufficient have been mentioned to show how utterly unreliable the testimony is to support the plaintiff’s case, both the private detective and the prostitute evidently having manufactured a case, the one to gratify revenge and the other to earn his fee.
The judgment should be reversed and a new trial had before another referee.
Daniels, J., concurs.
Bartlett, J
I fully concur with the conclusion reached by the presiding justice in this remarkable case. It is to be hoped that the views expressed in his opinion will serve to impress upon referees in divorce suits the importance of scrutinizing with vigilant distrust the testimony of prostitutes and private detectives.